# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.  11-CR-20350-LENARD/O'SULLIVAN(s)

**UNITED STATES OF AMERICA**

**v.**

**MATTHEW ANDREW CARTER,**
**a/k/a "William Charles Harcourt,"**
**a/k/a "Bill Carter,"**

      **Defendant.**
_____/

### UNITED STATES' NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 413, 414, AND 404(b)

The United States of America, by and through the undersigned government attorneys, hereby files this Notice of Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 413, 414, and 404(b) at trial.  The United States intends to introduce, pursuant to Rules 413 and 414, evidence of several other offenses of sexual assault and child molestation committed by the Defendant to show his propensity to commit the offenses charged in the Superseding Indictment. Alternatively, the United States will seek to introduce this evidence as other crimes, wrongs, or acts pursuant to Rule 404(b) in order to prove Defendant's motive, intent, plan, knowledge, *modus operandi,* and/or absence of mistake or accident.

Additionally, the United States intends to introduce other acts evidence pursuant to Rule 404(b) in order to prove Defendant's motive, intent, plan, knowledge, *modus operandi,* and/or absence of mistake or accident.  This evidence is different from the evidence that the United States seeks to introduce pursuant to Rule 413 and 414.

Rule 413 provides in relevant part that in a case like the instant one, where "the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant."  *See* Fed. R. Evid. 413(a).  Rule 413 defines "offense of sexual assault" as:

> a crime under Federal law or the law of a State (as defined in section 513 of title 18, United States Code) that involved… (1) any conduct proscribed by chapter 109A of title 18, United States Code; (2) contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person; (3) contact, without consent, between the genitals or anus of the defendant and any part of another person's body; (4) deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person; or (5) an attempt or conspiracy to engage in conduct described in paragraphs (1)-(4).

Fed. R. Evid. 413(d).

Rule 414 provides in relevant part that where a "defendant is accused of an offense of child molestation," as in this case, "evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant."  *See* Fed. R. Evid. 414(a).  Rule 414 defines "child" as "a person below the age of fourteen."  It further defines the term "offense of child molestation" to mean:

> a crime under Federal law or the law of a State (as defined in section 513 of title 18, United States Code) that involved…(1) any conduct proscribed by chapter 109A of title 18, United States Code, that was committed in relation to a child; (2) any conduct proscribed by chapter 110 of title 18, United States Code; (3) contact between any part of the defendant's body or an object and the genitals or anus of a child; (4) contact between the genitals or anus of the defendant and any part of the body of a child; (5) deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on a child; or (6) an attempt or conspiracy to engage in conduct described in paragraphs (1)-(5).

Fed. R. Evid. 414(d).

Rule 404(b) provides in relevant part that:

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b).

## I.   PROCEDURAL AND FACTUAL BACKGROUND

### A.   The Charged Conduct

On May 4, 2011, Defendant Matthew Andrew Carter, a/k/a "William Charles Harcourt," a/k/a "Bill Carter," (hereinafter "the Defendant"), a U.S. citizen, was charged by complaint with traveling in foreign commerce from the United States to Haiti for the purpose of engaging in illicit sexual conduct with minors, in violation of Title 18, United States Code, Section 2423(b), and with engaging in illicit sexual conduct with minors, in violation of Title 18, United States Code, Section 2423(c).[1]  [D.E. 3].

As detailed in the Complaint affidavit, and as the government will prove at trial, beginning sometime in the mid-1990s until his arrest on May 8, 2011, the Defendant operated the Morning Star Center (hereinafter "the Center") in the vicinity of Port-au-Prince, Haiti.  The

---

[1]     The term "illicit sexual conduct," as used in 18 U.S.C. §§ 2423(b) and (c), "means (1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; or (2) any commercial sex act (as defined in section 1591) with a person under 18 years of age."  *See* 18 U.S.C. §2423(f).

The United States uses the term "minor" in this Notice to refer to persons under the age of eighteen.

Center was a residential facility that provided shelter, food, toys, money, and schooling to Haitian minors and young adults whose families could not afford to care of them.  Although the Center was commonly referred to as an orphanage by those familiar with the Defendant and the Center, many of the children were not orphans.  Rather, the children's families had extremely limited means.  Families sent their children to the Center in order for the children to receive the material support and educational opportunities that these families were otherwise unable to provide.

Between the mid-1990s and the Defendant's arrest in May 2011, the Defendant traveled between the United States and Haiti frequently in order to raise charitable funds to finance the continued operation of the Center.  While in the United States, the Defendant visited and spoke at various churches, including several churches in the suburbs of Detroit, Michigan, in order to raise money for the Center.

Between the Center's opening in the 1990s and April 7, 2011 (*i.e.,* the date of Defendant's last trip from Haiti to the United States before his arrest), the Defendant regularly engaged in illicit sexual conduct with the Haitian minors in his care and custody at the Center. In general, the illicit sexual conduct consisted of the Defendant performing oral sex on the minors, requiring the minors to perform oral sex on the Defendant, requiring the minors to masturbate the Defendant, and/or the Defendant touching the minors' nude genitalia.  According to these minor victims, the Defendant made the minors' participation in illicit sexual conduct with the Defendant necessary in order for the minors to receive gifts and/or money, and/or to continue receiving the shelter, food, and schooling that the Defendant provided through the Center.  According to the victims, the Defendant often committed these sexual acts at night, after everyone at the Center had gone to bed.

On June 23, 2011, a federal grand jury sitting in the Southern District of Florida returned a four-count superseding indictment charging the Defendant with violations of Title 18, United States Code, Section 2423(b) on or about October 2, 2001, October 30, 2003, November 27, 2004, and February 27, 2006. [D.E. 22].

**B.      Factual Background Relating to Defendant's Other Offenses of Sexual Assault and Child Molestation**

At trial, the United States intends to introduce evidence showing that the Defendant sexually assaulted and/or molested at least eight (8) minors between approximately 1972 and 1992.  The circumstances surrounding these offenses are as follows.[2]

Between approximately 1969 and 1977, the Defendant lived in the vicinity of London, England.  During that period, the Defendant worked for at least two residential children's homes. In or around December 1971, the London Borough of Wandsworth hired the Defendant to be the Deputy Superintendent of a residential children's home in Tooting, located at 177 Blackshaw Road (hereafter, the "Blackshaw home").  In or around August 1973, the London Borough of Bromley hired the Defendant to be the Superintendent of the Reynolds House, a residential children's home located at 131 Widmore Road.

On November 29, 1974, the Defendant was charged in England with indecent assault of minors.  These charges arose from allegations of sexual abuse made by minors when the Defendant was Superintendent of the Reynolds House.  While these charges were pending, the London Borough of Bromley terminated the Defendant's employment at the Reynolds House. The Defendant was subsequently tried.  On June 5, 1975, he was acquitted of these charges.  The

---

[2]      For purposes of this Notice, the United States will refer to witnesses that are victims of sexual assault or child molestation by their initials in order to protect their privacy.

The United States, however, has disclosed the full names of the witnesses referenced in this Notice to the Defendant through his counsel.  Additionally, the United States has produced to the Defendant law enforcement reports that summarize the statements made by these witnesses to law enforcement officers.

United States does not intend to introduce evidence in its case-in-chief relating to this criminal investigation and prosecution, or the circumstances of the Defendant's termination from the Reynolds House.

The United States intends to introduce the testimony of S.T. who lived at the Blackshaw home between approximately 1972 and 1979. S.T. will testify that when he was approximately nine (9) years old, the Defendant molested S.T. by forcing S.T. to masturbate the Defendant's bare penis in the middle of the night, and by fondling and kissing S.T.'s bare penis.

In or about 1975, the Defendant befriended a family of five (5) minor children who lived with their mother in public housing in South London. The United States intends to introduce evidence showing that from in or around 1975 through in or around 1979, the Defendant sexually assaulted and/or molested at least four (4) of these siblings. Specifically, P.M., D.J.M., I.M., and S.M. will testify variously that when they were minors, the Defendant forced them to masturbate him, touched their bare and covered genital regions, performed oral sex on them, sodomized or attempted to sodomize them, and often woke them in the middle of the night to engage in this sexual conduct. Subsequently, the Defendant apologized to I.M. for this sexual abuse and asked for I.M.'s forgiveness. Notably, the facts and circumstances involving this South London family are unrelated to the criminal charges brought against the Defendant in 1975.

In or around 1981, the Defendant was living in Ohio and was engaged to be married to Barbara Heinlein. The United States intends to introduce evidence that before their marriage, the Defendant tacitly admitted to Ms. Heinlein that he had sexually abused children in the past while living in England. Ms. Heinlein will also testify that after they divorced the Defendant asked Ms. Heinlein to forgive him for what she believed to be an encounter with a boy.

In or around 1992, the Defendant was living in Winter Haven, Florida.  The United States intends to introduce the testimony of A.J. who will testify that when he was approximately ten (10) years old, the Defendant performed oral sex on A.J.  The United States also will seek to introduce the testimony of R.S. who will testify that when he was approximately eight (8) years old, the Defendant would ask R.S. to perform oral sex on him (Defendant), and would try to place R.S.'s hands on Defendant's genital area.

In 1992, in Polk County, Florida, the Defendant was charged by the State of Florida with three (3) counts of sexual battery on a child under the age of twelve, and one (1) count of lewd/lascivious/indecent act upon a child.  *See State of Florida v. Matthew A. Carter A/K/A William C. Harcourt*, Fla. Cir. Ct. Case No. CF92-4597A1-XX & Case No. CF92-4330A1-XX.  The State's charges were based on allegations of molestation made by other victims and not the allegations made by A.J. or R.S.  However, R.S. testified for the State at the Defendant's trial.  On November 10, 1993, the Defendant was acquitted of all charges.  The United States does not intend to introduce any evidence in its case-in-chief relating to this Florida investigation or prosecution.

## II.    EVIDENCE TO BE INTRODUCED PURSUANT TO RULES 413 AND 414

Pursuant to Rules 413 and 414, the United States seeks to introduce evidence showing that the Defendant sexually assaulted and/or molested at least eight (8) minors prior to the conduct charged in the Superseding Indictment.  Alternatively, the United States seeks to introduce this evidence pursuant to Rule 404(b).  Consistent with Rules 413 and 414, the following is a summary of the testimony that the United States intends to offer at trial.

**A.      Defendant's Sexual Assault and Child Molestation of Six Minors from 1972 to 1979**

> ***1.      Testimony of S.T. Pursuant to Rule 414***

At trial, the United States intends to introduce the testimony of S.T., who will testify that between approximately 1972 and 1974, the Defendant molested S.T. by touching S.T.'s genitals, kissing his genitals, and forcing S.T. to masturbate the Defendant.  The following is a summary of S.T.'s testimony.

S.T. was born in 1963.  His mother was a prostitute and he believes that his father was her pimp.  S.T. recalls that when he was two (2) years old, he and his older brother lived in a residential children's home at a convent.  When S.T. was approximately eight (8) years old, he and his brother, who was about ten (10) years old, were moved to another children's home called Earlsfield House.  They lived there for about one to two years.  S.T. and his brother then moved to the Blackshaw home when S.T. was approximately nine (9) years old.  At the Blackshaw home, S.T. met the Defendant who was the Deputy Superintendent of the home.  The Defendant resided in an apartment on-site.  At this time, S.T. knew the Defendant as "William Harcourt" and "Bill."

In his apartment, the Defendant had the only color television available at the Blackshaw home.  The Defendant would invite the boys to his apartment to watch football matches on the color television.  When the boys entered the Defendant's apartment to watch television, the Defendant sat in a large recliner chair in front of the television.  The boys sat on the floor in front of the Defendant's chair.  The last boy to enter the room sat on the Defendant's lap when there was no room left to sit on the floor.  S.T. recalls that at first, the boys were very excited to watch television in the Defendant's apartment.  However, after a period of time, the boys did not want

to go to the Defendant's apartment, and the Defendant resorted to ordering the boys to come to his apartment to watch television.

S.T. did not enjoy football and, therefore, he did not join the other boys on these television-watching visits to the Defendant's apartment. However, some time thereafter, the Defendant ordered S.T. to join the other boys in his (the Defendant's) apartment. On one occasion, S.T. was the last boy to enter the Defendant's apartment and could not find a place to sit on the floor. S.T. was, therefore, forced to sit on the Defendant's lap. The Defendant placed S.T. on his lap and placed a pillow over S.T.'s lap. As the other boys watched television in front of the Defendant's chair, the Defendant reached under the pillow and under S.T.'s waistband. The Defendant proceeded to rub S.T.'s bare penis. As the Defendant rubbed S.T.'s penis, S.T. could hear the Defendant breathing heavily. The Defendant continued to rub S.T.'s penis until the football match ended. Once the match ended, S.T. left the Defendant's apartment with the other boys. On later occasions, S.T. was again ordered by the Defendant to go to the Defendant's apartment to watch television with the other boys, and S.T. was abused in the same fashion.

During his time at the Blackshaw home, S.T. developed some kind of skin condition that required the application of cream to the affected areas of his body. The Defendant became responsible for applying this cream to S.T.'s skin. Thus, for approximately one week the Defendant brought S.T. to the Defendant's apartment. The Defendant would sit in his recliner chair and have S.T. stand naked in front of the Defendant. The Defendant would then apply the cream to S.T.'s body and genitals. The Defendant continued to "play" with S.T.'s genitals long after the Defendant had applied the cream to the affected areas of S.T.'s skin.

While at the Blackshaw home S.T. shared a bedroom with three or four other boys. On several occasions, S.T. saw the Defendant enter his (S.T.'s) bedroom in the middle of the night, awaken one of the boys, and leave the room with the boy. The boy would return to the bedroom alone after a period of time. The Defendant did not pick the same boy each time this occurred.

On one occasion, the Defendant came into S.T.'s bedroom in the middle of the night, awoke S.T., and took him to a bathroom. Once in the bathroom, the Defendant untied his robe and revealed that he was naked underneath. The Defendant then took S.T.'s hand, placed it on the Defendant's penis, and held S.T.'s hand in place while the Defendant masturbated. The Defendant then ejaculated onto S.T. S.T. returned to his bedroom. After this incident S.T. got a metal bucket and balanced it on top of their bedroom door at night so that a sound would be heard if someone entered their room. Additionally, S.T. told the man in charge of the Blackshaw home about what the Defendant had done. S.T. ran away from the home about two weeks after the bathroom incident. Finally, S.T. recalls that during his time at the Blackshaw home the Defendant also kissed S.T.'s genital region.

### 2.    Testimony of P.M. Pursuant to Rule 413

At trial, the United States intends to introduce the testimony of P.M. who will testify that the Defendant sexual abused P.M. from in or around 1976, when P.M. was approximately sixteen (16) years old, until in or around 1977, when P.M. was approximately seventeen (17) years old. The Defendant sexually assaulted P.M. by forcing P.M. to masturbate the Defendant, by touching P.M.'s penis, and, on one occasion, by sodomizing P.M. The following is a summary of P.M.'s testimony.

P.M. was born in 1959 and grew up in South London with his mother and four (4) younger siblings, including his brothers D.J.M. and I.M., and his sister S.M. Their family was

very poor.  P.M. met the Defendant when he (P.M.) was approximately fifteen (15) years old through another boy in his neighborhood.  P.M. knew the Defendant as William or Bill Harcourt. The Defendant was known in P.M.'s neighborhood as the American man who took neighborhood children to McDonald's.  Shortly after P.M. met the Defendant, the Defendant regularly took P.M. and his siblings to McDonald's.

The Defendant sexually assaulted P.M. for the first time in approximately 1976 when the Defendant took P.M. and other children on a camping trip in the Defendant's van.  During this trip the Defendant laid next to P.M. in the middle of the night while P.M. was sleeping in the van.  The Defendant then grabbed P.M.'s hand and placed it on the Defendant's penis underneath the Defendant's clothes.  The Defendant then touched P.M.'s penis underneath P.M.'s clothes. The Defendant took P.M. camping in that van approximately two (2) to three (3) times and on each of those trips the Defendant touched P.M.'s penis and/or forced P.M. to touch the Defendant's penis.  This conduct occurred in the middle of the night while everyone was sleeping.

P.M. will further testify that in or around 1976, the Defendant took P.M. on a trip outside of London to a place called Hildenborough Hall.  While at Hildenborough Hall, the Defendant took P.M. into a back room and sodomized P.M.

During this period the Defendant lived near P.M. and his family in the Crystal Palace area of London.  The Defendant would regularly have P.M. and P.M.'s siblings sleep at the Defendant's apartment.  During these overnight visits, the Defendant would approach P.M. in the middle of the night while P.M. was sleeping and touch P.M.'s penis underneath his clothing. The Defendant also would force P.M. to touch the Defendant's penis.

### 3.   *Testimony of D.J.M. Pursuant to Rules 413 and 414*

At trial, the United States intends to introduce the testimony of P.M.'s younger brother, D.J.M.  D.J.M. will testify that the Defendant sexually abused D.J.M in England and in the United States from in or around 1974 or 1975, when D.J.M. was approximately thirteen (13) years old, through in or around 1978, when D.J.M. was about seventeen (17) years old.  The Defendant molested and sexually assaulted D.J.M. by performing oral sex on D.J.M., forcing D.J.M. to masturbate him (the Defendant), fondling D.J.M.'s genitals, and, on one occasion, attempting to sodomize D.J.M.  The following is a summary of D.J.M.'s testimony.

D.J.M. was born in 1961.  D.J.M. grew up in a very poor neighborhood in South London with his four (4) siblings and his mother, who was an alcoholic that did not always work.  He and his family lived in public housing, and their homes often lacked hot water and heat.

In or around 1974 or 1975, when he was about thirteen (13) years old, D.J.M. met the Defendant in his (D.J.M.'s) neighborhood.  D.J.M. knew the Defendant as "William" or "Bill Harcourt."  D.J.M. knew the Defendant as the American who took the neighborhood children to the McDonald's.  This was a special treat for D.J.M. and his siblings who could not afford this themselves.  D.J.M. started joining his brother P.M. on these trips to McDonald's with the Defendant.  The Defendant would pick up D.J.M., his siblings, and other neighborhood children in a van, drive them to McDonald's, and buy them food.  The Defendant also had D.J.M. and his siblings visit the Defendant at his apartment in Crystal Palace where they would often sleep over.  The Defendant also gave D.J.M. clean clothing and blankets, and took D.J.M. and his siblings on trips.

Shortly after D.J.M. joined P.M. and the Defendant on the McDonald's excursions, the Defendant befriended D.J.M.'s mother and began visiting D.J.M.'s home often.  The Defendant

also slept at D.J.M.'s house regularly and often came into D.J.M.'s bedroom at night to talk to

him.  One evening, the Defendant entered D.J.M.'s bedroom and spoke to D.J.M. briefly.  The

Defendant then reached under the covers and beneath D.J.M.'s underwear, and touched D.J.M's

penis and genital region.  D.J.M. recalls that his back was turned away from the Defendant.  This

sexual abuse continued thereafter and generally occurred while the lights were off in D.J.M's

bedroom or at Hildenborough Hall, where the Defendant occasionally took D.J.M. and/or

D.J.M.'s family.

In addition to touching D.J.M's genitals, the Defendant would regularly force D.J.M. to

masturbate him (the Defendant).  Specifically, the Defendant would place D.J.M.'s hand on his

(the Defendant's) penis, hold D.J.M.'s hand in place, and use D.J.M's hand to masturbate until

he (the Defendant) ejaculated.  The Defendant also regularly performed oral sex on D.J.M.  On

one occasion, during a trip to Hildenborough Hall, the Defendant attempted to sodomize D.J.M.

D.J.M. recalls that the Defendant attempted to insert his penis into D.J.M's anus.  D.J.M. recalls

straining and clenching his buttocks until the Defendant stopped trying to penetrate D.J.M.

In the summer of 1977, when he was approximately fifteen (15) or sixteen (16) years old,

the Defendant invited D.J.M. to the United States so that D.J.M. could attend an American high

school.  D.J.M. traveled to Ohio with the Defendant and stayed there for about one year.  D.J.M.

and the Defendant lived with the Defendant's sister, her husband, and their children.

During part of this time period, D.J.M. and the Defendant shared bunk beds in the same

bedroom at the sister's home.  In the middle of the night, the Defendant would reach under

D.J.M.'s covers and clothing to touch D.J.M.'s genitals.  The Defendant also performed oral sex

on D.J.M. and forced D.J.M. to masturbate him.  This abuse occurred at least once per week.

During D.J.M.'s stay in the United States, the Defendant's sister and her family moved within

Ohio to a different house. In this new house, D.J.M. and the Defendant slept in separate beds in the basement. However, the Defendant continued to sexually abuse D.J.M. as he had in the previous house.

### 4. Testimony of I.M. Pursuant to Rules 413 and 414

At trial, the United States intends to introduce the testimony of P.M. and D.J.M.'s younger brother, I.M. I.M. will testify that the Defendant sexually abused him in England and the United States from in or around 1975, when he was approximately twelve (12) years old, through in or around 1978, when he was about fifteen (15) years old. The Defendant molested and sexually assaulted I.M. in the same way that he abused P.M. and D.J.M. – by performing oral sex on I.M., forcing I.M. to masturbate him (the Defendant), fondling I.M.'s genitals, and, on two occasions, attempting to sodomize I.M. The following is a summary of I.M.'s testimony.

I.M. was born in 1963. I.M. lived with his mother and his siblings in public housing under very poor conditions in an underprivileged part of South London. I.M. met the Defendant in or around 1975 when I.M. was about twelve (12) years old. He knew the Defendant as "William Harcourt," or "Bill." I.M. knew the Defendant as the American man who regularly took poor children from the neighborhood, including I.M. and his brothers, to McDonald's in a van. Over time, however, the Defendant focused much of his attention on I.M. and his family and stopped taking the other neighborhood children to McDonald's.

Sometime after I.M. met the Defendant, the Defendant introduced himself to I.M.'s mother and would visit I.M. and his family frequently. During this period, the Defendant purchased beds for I.M.'s family, and bought I.M. clothes, sneakers, a skateboard, food, and ice cream. The Defendant also took I.M. to the movies and, occasionally, gave I.M. money.

The Defendant molested I.M. for the first time in the backyard of I.M.'s home in South London.  According to I.M., the Defendant helped I.M. construct a tent in I.M.'s backyard so that I.M. could sleep in it that night.  The Defendant awoke I.M. that evening by entering the tent, lying next to I.M. and placing I.M.'s hand on his (the Defendant's) penis.  The Defendant held I.M.'s in place and used it to masturbate.  That night the Defendant touched I.M.'s penis as well. After this tent incident, the Defendant would force I.M. to masturbate him at least once per week. The Defendant sexually abused I.M. in this fashion at I.M.'s home, in the Defendant's van, and at the Defendant's apartment in Crystal Palace, where I.M. and his siblings often slept.

In or around 1976, the Defendant hosted I.M.'s thirteenth birthday party.  I.M. recalls that sometime after his thirteenth birthday, the Defendant performed oral sex on I.M. for the first time.  The first instance of oral sex occurred at the Defendant's apartment on a night when I.M. was staying over.  The Defendant turned I.M. over, and performed oral sex on I.M.  I.M. pretended to be asleep, but he recalls hearing the Defendant make loud moaning sounds as he abused I.M.  Thereafter, in addition to regularly fondling I.M.'s penis and forcing I.M. to masturbate the Defendant, the Defendant frequently performed oral sex on I.M.

In general, the Defendant would sexually abuse I.M. a couple of hours after I.M. went to sleep.  The Defendant would approach I.M. at night, take off I.M.'s clothes, rub I.M.'s back for several minutes, and then rub I.M.'s genitals.  When the Defendant performed oral sex on I.M., I.M. did not ejaculate.

The Defendant also attempted to sodomize I.M. twice during this period of abuse in England.  I.M. recalls squeezing his buttocks tightly until the Defendant stopped.

In the summer of 1978, when I.M. was approximately fifteen (15) years old, he traveled to Ohio to visit his brother D.J.M.  I.M. enrolled in school and stayed in the United States until

approximately January 1979.  During that period, I.M. lived with D.J.M. in the Defendant's

sister's home.  He recalls sleeping in the basement with D.J.M. and another teenage boy.  During

I.M.'s stay in the United States, the Defendant would fondle I.M.'s penis beneath I.M.'s clothing

whenever the Defendant had the opportunity.

In or about the summer of 1978, I.M. told the Defendant's sister that the Defendant had

been touching him.  In response, the Defendant's sister cried and thereafter, the Defendant no

longer slept in his sister's house.  Rather, the Defendant slept in a trailer outside of the house.

I.M. saw the Defendant in the 1980s when I.M. was in his early twenties.  The Defendant

contacted I.M. during the Defendant's trip to London.  The Defendant took I.M. to a McDonald's

restaurant where the Defendant told I.M. that the Defendant wanted to apologize to I.M. for what

he had done.  The Defendant asked I.M. to forgive him (the Defendant) for sexually abusing I.M.

The Defendant told I.M. that he was now a missionary with an evangelic church, and that the

church was praying for the Defendant because the church believed that the Defendant's problem

(*i.e.*, his sexual desires for children) was demonic and that the Defendant had demons.  However,

the Defendant told I.M. that his demons would leave when they were ready and that he did not

need prayer.  I.M. told the Defendant that the Defendant had to control his sexual desires for

children.

### 5.    *Testimony of S.M. Pursuant to Rule 414*

At trial, the United States intends to introduce the testimony of S.M., the younger sister

of P.M., D.J.M., and I.M.  S.M. will testify that in or around 1978 or 1979, when she was

approximately twelve (12) or thirteen (13) years old, the Defendant molested S.M. when she

visited the United States.  The Defendant abused S.M. by touching her clothed genitals, forcing

her to touch his penis, and exposing his penis to her.  The following is a summary of S.M.'s testimony.

S.M. was born in 1966.  S.M. grew up in London with her mother, who had a drinking problem, and her four brothers.  She met the Defendant, whom she knew as "William Harcourt" or "Bill," in or around 1976, when she was ten (10) years old.  S.M. first met the Defendant when he visited her siblings at their home.  During this period, the Defendant took S.M., her mother, and her siblings on overnight trips to Hildenborough Hall and to a home for boys in Stevenage.  The Defendant also took S.M.'s brothers to the movies and, on one occasion, he took S.M. to the Hard Rock Café.

S.M. recalls that when she was approximately twelve (12) or thirteen (13) years old, she traveled to the United States to visit her brothers.  S.M. and her mother lived at the Defendant's sister's home in Ohio with S.M.'s brothers.  S.M. stayed in the United States for approximately four months.  During this visit, S.M. spent most of her weekdays at home while her brothers attended school.  The Defendant would take S.M. for rides in his truck to the store or on other errands.  While the Defendant drove, he would pull S.M. close to him, wrap his arm around her, and hold onto her.  He would also touch her inner thighs and genital region (above her clothing) and place her hand on his penis.  The Defendant would also expose his penis to S.M.  The Defendant took S.M. for rides in his truck several times a week and would abuse her in this manner during those truck rides.

### 6. *Testimony of Barbara Heinlein Pursuant to Rules 413 and 414*

The United States intends to introduce the testimony of Barbara Heinlein.  She will testify that on two separate occasions, the Defendant tacitly admitted to sexually abusing young boys.  The following is a summary of Ms. Heinlein's testimony.

In or around 1980, Ms. Heinlein met the Defendant in Ohio. Ms. Heinlein knew the Defendant as "William Harcourt" or "Bill." They both attended a Bible study group for born-again Christians. The Defendant and Ms. Heinlein then became engaged to be married. Before she married the Defendant, Ms. Heinlein learned from another member of the Bible study group that the Defendant had been accused of sexually abusing children in the past when he lived in England. Later that day, Ms. Heinlein directly confronted the Defendant about the sexual abuse allegations. The Defendant explained to Ms. Heinlein that he had not been a Christian at that time, and only later had become a Christian. The Defendant also recounted how he was able to evade responsibility for the abuse. Due to her Christian beliefs at that time, Ms. Heinlein accepted his explanation and married the Defendant on or about September 11, 1981.

In or around 1983, the Defendant and Ms. Heinlein divorced. Following the divorce, the Defendant told Ms. Heinlein that he wanted to "confess" that during their marriage he had an "encounter." Ms. Heinlein asked the Defendant with whom the "encounter" occurred. The Defendant did not respond. Based on her prior conversations with the Defendant regarding the sexual abuse allegations in England, Ms. Heinlein understood the Defendant to be referring to an "encounter" with a boy.

**B.     Defendant's Molestation of Two Minors in 1992**

> *1.      Testimony of A.J. Pursuant to Rule 414*

At trial, the United States intends to introduce the testimony of A.J. who will testify that in or around 1992, when A.J. was eleven (11) years old, the Defendant performed oral sex on him. The following is a summary of A.J.'s testimony.

A.J. was born in 1980. A.J. grew up in Winter Haven, Florida. He met the Defendant, known to A.J. as "Bill Carter," in or around 1992, when A.J. was about eleven (11) years old. A.J. recalls seeing the Defendant hanging around other children in his (A.J.'s) neighborhood.

The Defendant was well-known in the neighborhood as the white man who took the neighborhood children to the Chuck E. Cheese restaurant, performed magic tricks for the children, bought games for the children, and took the children for rides on his motorcycle.  When the Defendant first started to frequent A.J.'s neighborhood, A.J.'s parents would not let him associate with the Defendant.  However, at some point, the Defendant came to A.J.'s home and asked A.J.'s parents for permission to spend time with A.J.  A.J.'s parents gave the Defendant permission.

Several days later, the Defendant asked A.J. and his younger brother to come to the Defendant's apartment.  The Defendant stated that he had games, and A.J. asked if the Defendant would perform magic tricks.  The Defendant then brought A.J. and his brother to the Defendant's apartment.  A.J. sat on the couch.  A.J.'s brother sat on the floor in front of the couch and played a handheld video game that the Defendant had given him.  The Defendant sat on the couch next to A.J. and started to rub A.J.'s leg.  The Defendant then unzipped A.J.'s pants, took A.J.'s penis out of his pants, and started to perform oral sex on A.J.

The oral sex lasted for several seconds and stopped when A.J. kicked his brother's back and got his brother's attention.  The Defendant immediately stood up and took A.J.'s brother to a window to distract him.  A.J. zipped his pants and left the Defendant's apartment with his brother.  A.J. went home and reported the incident to his mother.

### 2.    *Testimony of R.S. Pursuant to Rule 414*

At trial, the United States intends to introduce the testimony of R.S. who will testify that in or around 1992, when R.S. was approximately eight (8) years old, the Defendant asked R.S. to perform oral sex on the Defendant, and attempted to have R.S. touch the Defendant's clothed genitals.  The following is a summary of R.S.'s testimony.

R.S. was born in 1984.  R.S. grew up in Winter Haven, Florida.  R.S. met the Defendant when he was approximately eight (8) years old.  The Defendant would give R.S. candy and take him for rides on the Defendant's motorcycle.  On these motorcycle rides, R.S. would sit behind the Defendant and wrap his arms around the Defendant's stomach to hold on.  Before and during the actual motorcycle rides, the Defendant would often move R.S.'s hands down to the Defendant's clothed genital region.  On several occasions, the Defendant asked R.S. to let the Defendant perform oral sex on R.S.

### III.    Evidence To Be Introduced Pursuant to Rule 404(b)

**A.    Testimony of S.T. Pursuant to Rule 404(b)**

S.T. will testify that at the Blackshaw home the Defendant had an undisputed favorite boy named D.M., who was approximately S.T.'s age and slept in S.T.'s bedroom.  S.T. recalls the Defendant taking D.M. from their bedroom one night.  At some point during S.T.'s time at the Blackshaw home, the Defendant took D.M. to the United States for approximately six weeks. The Defendant permitted D.M. to select six friends from the home to go with them.

S.T. will also testify that shortly after the incident in which the Defendant molested S.T. in the bathroom, the Defendant left the Blackshaw home and became the Superintendent of the Reynolds House, a residential children's home in Bromley.  The Defendant brought S.T. and S.T.'s brother to this children's home for an overnight visit.  S.T. shared a bed with his brother. That night, S.T. saw the Defendant enter the room in which they were staying and take S.T.'s brother from their bed.  S.T. recalls that his brother tried to resist the Defendant by holding onto S.T.'s leg.  The Defendant, however, was able to pull the boy away.  After some time, his brother returned to their bed.

**B.      Testimony of I.M. Pursuant to Rule 404(b)**

As previously stated I.M. visited the United States in the summer of 1978 and returned to England in or around January 1979.  Thereafter, I.M. traveled back to the United States with a friend from London.  I.M. saw the Defendant during this trip.  On at least two occasions during this visit, I.M. and the Defendant drove around a neighborhood in search of a boy.  The Defendant told I.M. that he (the Defendant) loved a boy that lived in this neighborhood, but that the boy's parents would not let the Defendant see him.  The Defendant spoke about the boy with tears in his eyes and explained to I.M. that the boy's parents did not understand.  The Defendant showed I.M. a picture of the boy which the Defendant kept in his wallet.  The boy was blonde, blue-eyed, and appeared to be thirteen (13) or fourteen (14) years old.  To I.M., the Defendant appeared to be infatuated with this boy.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY


BY:      *s/Maria K. Medetis*
         Maria K. Medetis
         Assistant United States Attorney
         Court Identification No.:  A5501214
         99 Northeast 4th Street
         Miami, Florida 33132-2111
         Tel: (305) 961- 9010
         Fax: (305) 530- 7976
         Maria.Medetis@usdoj.gov


BY:      *s/Bonnie L. Kane*
         Bonnie L. Kane
         Trial Attorney
         Child Exploitation and Obscenity Section
         Criminal Division, U.S. Department of Justice
         1400 New York Avenue, NW
         Washington, D.C.  20530

Tel:  (202) 514-5780
Fax:  (202) 514-1793
Bonnie.Kane@usdoj.gov


**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on November 22, 2011, I electronically filed the foregoing

United States' Notice of Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 413,

414, and 404(b) with the Clerk of the Court using CM/ECF.  I also certify that a true and correct

copy of the foregoing was delivered via Federal Express to counsel for the defendant Paul

Korchin, AFPD and Kashyap Patel, AFPD, Federal Public Defender's Office,150 W. Flagler

Street, Suite 1500, Miami, FL 33130.

*<u>s/Maria K. Medetis</u>*
Maria K. Medetis
Assistant United States Attorney